**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| PUI AUDIO, INC., | : | |
| | : | |
| Plaintiff, | : | Case No. 3:21-cv-284 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| MICHAEL VAN DEN BROEK, *et al.*, | : | |
| | : | |
| Defendants. | : | |

_____

**ENTRY AND ORDER MODIFYING AND EXTENDING THE TEMPORARY
RESTRAINING ORDER**
_____

In accordance with the Court's October 21, 2021 Order (Doc. No. 10) (the "10/21 Order"),

the Court held an evidentiary hearing on November 1, 2021 to decide whether to extend, modify,

or terminate the temporary restraining order set forth in the 10/21 Order. Plaintiff PUI Audio, Inc.

("PUI"), Defendant Michael Van Den Broek ("Van Den Broek"), and Defendant MISCO, Inc.

("MISCO" and, collectively with Van Den Broek, "Defendants") all appeared with counsel at the

November 1 evidentiary hearing. Additionally, Van Den Broek, MISCO's Chief Executive

Officer, and PUI's Chief Executive Officer each testified during the hearing. Prior to the hearing,

Defendants filed a Hearing Memorandum (Doc. No. 16), in which they argued that the temporary

restraining order should be dissolved.

The Court finds that good cause exists to modify and extend the temporary restraining order

(the terms of which are specified in the 10/21 Order (Doc. No. 10 at PageID 96-97)). For the

reasons discussed below, and in accordance with Federal Rule of Civil Procedure 65, the Court (1)

**MODIFIES** the terms of the temporary restraining order to more directly specify that Van Den

Broek is prohibited from being employed by—or otherwise working for—MISCO; and (2)

1

**EXTENDS** the temporary restraining order (as modified) until and including November 18, 2021 or until further order of this Court (whichever is earlier).

## I.    **BACKGROUND**

The 10/21 Order provides background regarding this case, as well as substantive legal principles regarding the claims brought by PUI and for determining whether to issue a temporary restraining order ("TRO"). (*See* Doc. No. 10.) This Order does not repeat that information, but assumes familiarity with it, and this Order should be read in connection with the 10/21 Order. Below, the Court provides additional background information, which is based on the testimony presented at the November 1 evidentiary hearing and exhibits admitted at that hearing. Four witnesses testified at the November 1 evidentiary hearing: (1) PUI's CEO, Paul Spain ("Spain"); (2) PUI's Vice President of Engineering, Barry Ricks ("Ricks"); (3) Van Den Broek; and (4) MISCO's President and CEO, Daniel Digre ("Digre").

### A.  **Testimony by Spain**

Spain testified that PUI provides audio products for equipment. This includes, for example, alarms inside of medical equipment and speakers inside of gas pumps. Its products include speakers, microphones, beepers, and buzzers. Speakers, which are a growing part of its product line, currently comprise approximately 30% of PUI's business. Once PUI has designed a product, it outsources the manufacturing to third-party manufacturers, although PUI itself does some finishing processes on the products (e.g., coating and testing). PUI also performs some product design; some of the products that it sells are designed for specific customer applications. And, PUI occasionally improves the design of its products with its manufacturing partners. PUI sells its products to equipment manufacturers, some directly and some through its distribution channel. PUI currently employs 22 people.

Spain testified that PUI was incorporated as a subsidiary of Projects Unlimited, Inc. in

2

2010.  In September of 2018, Projects Unlimited, Inc. sold PUI to a private equity company (Champlain Capital).  However, PUI continued to do business as PUI, with no change in its employees or customers.  Van Den Broek signed the Agreement (Doc. No. 1-1) as an employee of PUI, and he remained an employee of PUI after its acquisition by Champlain Capital—which acquired PUI in totality, including its building, existing agreements, etc.

Spain also testified that PUI has employment agreements like the one signed by Van Den Broek in order to protect PUI's trade secrets and intellectual property.  He identified the following as being among PUI's trade secrets: product designs, an online simulator that PUI developed, its product roadmap (i.e., the new products planned to be introduced over the next 12 to 18 months), the identity of its manufacturing partners, the identity of its customers, and its processes to customize products to meet customer applications.  He also noted that PUI's costs and profit margins are confidential.  According to Spain, this is all information that PUI has spent a lot of time, money, resources, and human capital in developing.  He stressed that PUI does not want its competitors to know what products it plans to launch over the next 12 to 18 months because a competitor could minimize the success of that product launch by bringing products out at the same time as (or before) PUI, or a competitor could otherwise promote one of its existing products against PUI's product being launched.

Spain testified that Van Den Broek was a key employee at PUI who had access to all of this information and was very involved with PUI's product development, product roadmap, company strategy, and development of the online simulator.  Van Den Broek's expertise is in speakers, so he spearheaded the development of speakers for PUI.  He also had access to (and a relationship with) PUI's manufacturing partners, distributors, and customers.  Van Den Broek worked closely with PUI's manufacturers in the development and manufacture of PUI's product

line.  He also worked with PUI's customers—which are located worldwide—to identify their needs and then develop a product for them with PUI's manufacturing partners.

Regarding competitors, Spain testified that—out of the thousands of companies in North America that sell speakers—PUI has about eight to ten key competitors, one of which is MISCO. He said that Van Den Broek was very familiar with the companies identified as PUI's key competitors because he helped create a "scorecard" to assess them.  (Van Den Broek admitted during his own testimony that he had helped PUI identify its potential competitors and that MISCO was one on the "scorecard.")  Spain acknowledged that PUI and MISCO do not overlap in every aspect of their product lines and markets, but he asserted that there is definite overlap between the two companies in terms of speakers.  He testified that, although some of MISCO's speakers are much larger than PUI's speakers, there is overlap in the small speaker range and that the technology used for small speakers would transfer to large speakers because they have similar components.  Spain also testified that MISCO had gained a position with PUI's largest distributor and that he knew of at least one large original equipment manufacturer to which both companies supply product (and for which MISCO has the capability to supply the same products to that customer that PUI does).[1]  Van Den Broek has a relationship with that customer and has intimate knowledge of PUI's product designs for that customer.  Spain also explained that, because Van Den Broek knows all of PUI's product costing, he could work with MISCO to undercut PUI at its largest distributor.  Approximately a quarter of PUI's sales come from that distributor and, according to Spain, if PUI lost its relationship with that distributor then it would be a substantial loss likely to result in laying off employees.  Additionally, Spain opined that, if PUI's speaker

---

[1] When questioned by opposing counsel regarding whether he knew of any other overlapping customers, Spain explained that he does not that knowledge because he does not know the identity of MISCO's customers and that he only knew about this one overlapping customer through the customer itself asking for a product quote.

4

market were compromised, then it would devastate PUI's business such that it would have to reassess its entire structure. (Van Den Broek acknowledged during his own testimony that, during his time at PUI, he worked closed with the large original equipment manufacturer referenced by Spain and worked with PUI's largest distributor.)

During questioning from opposing counsel, Spain testified that he had reached out to MISCO and other competitors of PUI in late 2019 or early 2020 to discuss potential product synergies. He ended up actually meeting with Digre and visiting MISCO's facilities in Minnesota around February of 2020. (*See* Def. Exs. G and H.)

Regarding Van Den Broek's announcement in April of 2021 that he intended to resign from PUI and join MISCO, Spain testified that he had reminded Van Den Broek at that time that working for MISCO was prohibited because Van Den Broek was subject to a non-compete agreement and knew that MISCO was one of PUI's competitors (given that they had been working on a competitor review together for the past two years). Spain also made a phone call to Digre at that time. Digre informed Spain that Van Den Broek had approached MISCO for employment, not the other way around. (Digre acknowledged during his own testimony that Spain had told him on that call that Spain thought it would be a problem for Van Den Broek to work at MISCO because it would be a violation of Van Den Broek's noncompete agreement.)

Regarding Van Den Broek's announcement in August of 2021 that he was resigning from PUI, Spain testified that Van Den Broek said he was going to be a "consultant." Spain reminded Van Den Broek of his obligations under the Agreement and contacted PUI's attorneys to send a letter to Van Den Broek to remind him again. That letter ended up being the August 26 Correspondence referenced in the 10/21 Order (*see* Doc. No. 10 at PageID 84). It was admitted as an exhibit during the November 1 evidentiary hearing. (Pl.'s Ex. 6.) PUI's attorneys sent the

August 26 Correspondence via FedEx to both Van Den Broek and Digre.  (*Id.*)  In it, PUI's counsel quotes from the Agreement's confidentiality, non-competition, and non-solicitation provisions. (*Id.*)  The August 26 Correspondence also warns Van Den Broek that "[t]hese restrictions are necessary to protect PUI's information, customer relationships, goodwill, and other legitimate business interests," that PUI "takes these obligations very seriously," and that PUI "will take all necessary legal steps should it learn that you are violating the terms of your Agreement."  (*Id.*) The August 26 Correspondence also states that, "[i]n addition to these contractual obligations, you have a common law obligation to protect PUI's trade secrets, and are prohibited by law from using or disclosing them."  (*Id.*)

Regarding PUI's discovery that Van Den Broek had become involved with MISCO, Spain testified about the multiple receipts from UBER and the email from a MISCO sales representative—all referenced in the 10/21 Order (*see* Doc. No. 10 at PageID 84).  Receipts and the email were admitted as exhibits during the November 1 evidentiary hearing.  (Pl.'s Exs. 7 and 8.)  Upon discovering this information, PUI contacted its attorneys and engaged a forensic analyst to look at Van Den Broek's computer activities.  Spain testified that PUI currently is not aware of any confidential information that has been misappropriated in connection with Van Den Broek leaving PUI and joining MISCO.  He mentioned that the forensic investigation remains ongoing and that PUI's concern is what may happen in the future given that, even with best intentions, it would be impossible for Van Den Broek to compartmentalize that information.  Spain also testified that, although he was not aware of any lost business or customers to MISCO, PUI's design cycle time is typically three to eighteen months, so PUI may not find out about it for awhile.

### B.  Testimony by Ricks

Ricks testified that Van Den Broek was PUI's main source of new product design.  Van Den Broek would work with customers, manufacturing partners, and PUI's sales staff to develop

new products that were suggested and brought to market. PUI tries to release two to three products quarterly. Ricks also testified that Van Den Broek knows PUI's internal procedure for coating speakers, which took PUI twelve to eighteen months (and $100,000 in equipment) to develop. Ricks explained that the coating procedure is not a technology that PUI's competitors have, it generates around a million dollars each year for PUI, and Van Den Broek has the knowledge to duplicate it. Ricks also testified that there have been a few instances where PUI has been asked by customers to "cross" (i.e., provide a cheaper replacement for) MISCO speakers.

### C. Testimony by Van Den Broek

During his testimony, Van Den Broek admitted that he developed new products at PUI, there are a few areas of overlap in business between MISCO and PUI (including some overlap in 50- to 100-millimeter speakers), and he worked on and had knowledge of the products in PUI's pipeline. He also acknowledged that, at some point, he worked with PUI to identify its potential competitors and that MISCO was one of the competitors on the "scorecard." However, he maintained that PUI and MISCO are completely different companies, explaining that PUI does not engage in customization of a product from scratch, while MISCO builds its products to a customer's specifications. He also testified that there was no real opportunity at PUI to do high-end audio work.

Regarding his contact with MISCO while employed by PUI, Van Den Broek testified that he had accepted a position at MISCO in April of 2021; he told PUI about it and was advised by Spain that perhaps he was in violation of the Agreement; he reached out to Digre in July of 2021 and asked if the job at MISCO was still available; he received a verbal offer from MISCO for a position later that month; and, he accepted that offer very soon thereafter. He also testified that he continued to work for PUI after he accepted the offer from MISCO, but that he signed the paperwork to start at MISCO during the last week of August. He offered his resignation to Spain

at PUI on August 18, 2021, but did not tell him at that time that he was going to work for MISCO; instead he told Spain that he was going to be a "consultant." Van Den Broek admitted that Spain reminded him of his obligations under the Agreement at the time of his resignation. To his knowledge, MISCO has been aware of his noncompete agreement with PUI since April of 2021.

Van Den Broek testified that he intended to honor his obligations under the Agreement. He stressed that he has not taken any information from PUI to his job at MISCO, he never would do so, and he has not provided any of PUI's pricing, customer, or confidential information to MISCO (nor had he been asked to do so). He also testified that the only thing he recalls using Dropbox for at PUI was to transfer 3-D models to companies, which would then use those models to help with PUI's marketing. According to Van Den Broek, anything that he put on Dropbox could be accessed by a third-party vendor, and if the vendor accessed anything then it would show up on Van Den Broek's computer as having been "modified." He left his laptop with PUI when he announced his resignation on August 18. However, he did not dispute a forensic analyst's finding that Van Den Broek had emptied the Dropbox on his laptop before he turned it in to PUI.

During his testimony, Van Den Broek admitted that he has performed services for MISCO since the time this Court issued the 10/21 Order. He testified that he began his employment with MISCO on August 23 and is employed by MISCO as a project design engineer. At MISCO, he works with companies to engineer high-end speakers. He testified that his work for MISCO, to date, has entailed discussing with customers what they want MISCO to build for them in terms of speakers, walking them through the MISCO process, identifying for them what MISCO products would work best for them (and if it is not something that MISCO has, then working with them on a custom part), and going over the design of the speakers with them.

Finally, Van Den Broek admitted that, when he began to work at MISCO, he knew that

8

PUI believed such work would violate the Agreement.  He also admitted that Spain had told him back in April of 2021 that going to work for MISCO would violate the Agreement.

###    D.  **Testimony by Digre**

Digre testified that MISCO is a family-owned business that currently employs approximately 70 people and has been in business since 1947.  He described MISCO as a custom manufacturer of loud speakers, and he has never considered PUI a competitor of MISCO.  Instead, according to Digre, the companies are complimentary with "little overlap between what PUI Audio does and what MISCO does."  However, Digre did admit that there is "some overlap" with PUI when considering MISCO's catalog of designs and products.  He also admitted that MISCO sells products through PUI's largest distributor (the one Spain testified about).

Digre admitted that he received a call from Spain in April of 2021 during which Spain told him that it would be a problem for Van Den Broek to work at MISCO because it would be a violation of Van Den Broek's non-compete agreement.  Yet, MISCO proceeded with hiring Van Den Broek in August.  Digre testified that, what interested him in Van Den Broek was not what he did at PUI, but what he had done at another company prior to working for PUI.  He expects Van Den Broek to help MISCO develop new product lines, interface with customers, and provide input into whether the customer's target price aligns with what MISCO would be doing.  Finally, Digre acknowledged he was aware that Van Den Broek had worked for MISCO since the time this Court issued the 10/21 Order.

## II.  **ANALYSIS**

Before a temporary restraining order expires, a court may extend it "for good cause" so long as the reasons for the extension are entered in the record.  Fed. R. Civ. P. 65(b)(2); *Am. Sys. Consulting, Inc. v. Devier*, 514 F. Supp. 2d 1001, 1009 (S.D. Ohio 2007) ("[o]nce granted, a temporary restraining order can be extended beyond its initial duration for good cause shown or

by the consent of the party against whom the order is directed") (internal quotation marks omitted). In determining whether to extend a TRO, generally a court considers the same factors used in determining whether to issue a TRO: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Am. Sys. Consulting*, 514 F. Supp. 2d at 1009-10 (extending TRO); *Sellers v. Univ. of Rio Grande*, 838 F. Supp. 2d 677, 689 (S.D. Ohio 2012) (extending TRO); *N.E. Ohio Coal. for the Homeless and Serv. Emps. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006) (setting forth factors considered in whether to issue a TRO). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *N.E. Ohio Coal. for the Homeless and Serv. Emps. Int'l Union, Local 1199*, 467 F.3d at 1009. "For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the" injunction. *Id.*

In their Hearing Memorandum, Defendants make three arguments: (1) PUI is not a competitor of MISCO; (2) PUI is an improper party to this action because it has "shown no evidence of its acquisition of the Agreement or the rights afforded thereunder"; and (3) PUI neither has nor will suffer immediate irreparable injury resulting from Van Den Broek's employment at MISCO. (Doc. No. 16.) Based on the testimony and exhibits admitted during the November 1 evidentiary hearing, the Court disagrees with Defendants' arguments for purposes of determining whether to modify and extend the temporary restraining order. As explained below, the Court finds "good cause" to modify and extend the temporary restraining order (whose terms are specified in the CONCLUSION section of the 10/21 Order). Based on the parties' arguments and

10

the evidence presented to date, PUI has demonstrated that the four factors referenced above, when balanced together, weigh in favor of continuing the temporary restraining order along with a modification that its terms more directly specify that Van Den Broek is prohibited from being employed by—or otherwise working for—MISCO. *Am. Sys. Consulting*, 514 F. Supp. 2d at 1009-10 (concluding that plaintiff had demonstrated good cause warranting an extension of the TRO, after considering the parties' briefing and oral arguments at an informal conference); *Sellers*, 838 F. Supp. 2d at 689 (extending TRO on same terms and conditions after finding that, when balancing the four factors, "a short continuance of the existing TRO can prevent irreparable injury, arguably furthers public policy, and is supported by an adequate, although not overwhelming, showing of the potential for [plaintiff's] claims to succeed").

### A.  Likelihood of Success on the Merits

Regarding the first factor, the Court finds that, at this stage of the litigation and based on what has been presented, PUI now has shown a strong likelihood of success on the merits of its breach of contract and tortious interference with contract claims, as well as a likelihood of success (though not a "strong" likelihood of success) on the merits of its misappropriation of trade secrets claims.[2]

Regarding the breach of contract claims, despite Defendants' argument that PUI is not a competitor of MISCO (Doc. No. 16), there is sufficient evidence to support that MISCO is a "business enterprise in competition with" PUI under the Agreement.[3]  Testimony presented at the

---

[2] This finding, as well as the Court's other findings in this Order, apply only to this Order.  The Court would newly consider each of the factors in connection with any motion for a preliminary injunction following a hearing on such a motion.  Fed. R. Civ. P. 65; *see also Am. Sys. Consulting*, 514 F. Supp. 2d at 1003 ("any findings of fact and conclusions of law made by a district court in addressing a request for injunctive relief are not binding at a trial on the merits") (citing *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004)).

[3] The non-compete provision in the Agreement states, in part:  "During his/her employment and for a period of twenty-four months after termination of employment with the Employer … the Employee shall not directly or indirectly, along or with others, or as an employee, consultant, officer, director, owner or shareholder of any entity or in any other capacity engage in a business enterprise in competition with the Employer.  For the purposes of this agreement, a

hearing demonstrates that both PUI and MISCO sell and/or manufacture a portion of the small speaker range, they have at least one customer in common for which both companies supply product, and MISCO also uses PUI's largest distributor. Testimony also supports that there have been instances where a customer has asked PUI to replace the MISCO speakers it has with a cheaper speaker made by PUI. Furthermore, the non-competition provision in the Agreement includes the following: "The Employee acknowledges that the Employer's competitors are located at various locations throughout the United States, and the Employee agrees that this [paragraph] shall prohibit him or her from performing services for any competitor anywhere in the United States." (Doc. No. 1-1 at PageID 32.) Testimony at the hearing supports that Van Den Broek knew that MISCO was one of the companies PUI had identified as a key competitor. As Spain testified, out of the thousands of companies in North America that sell speakers, PUI had identified only eight to ten key competitors—one of which was MISCO—and that Van Den Broek knew that and was involved in that process.

As referenced above, Defendants argue that PUI has "shown no evidence of its acquisition of the Agreement or the rights afforded thereunder." (Doc. No. 16.) However, Spain's testimony provided at least some evidence, which the Court finds sufficient at this stage to support modifying and extending the TRO. Spain testified that Van Den Broek signed the Agreement (Doc. No. 1-1) as an employee of PUI, he remained an employee of PUI after its acquisition from Projects Unlimited, Inc. by Champlain Capital (which acquired PUI in totality, including its existing agreements), and PUI continued to do business as PUI, with no change in its employees or customers.

---

business enterprise in competition is defined as an entity which manufactures, fabricates[,] sells or seeks to sell products or services of a similar nature to those manufactured, sold or offered by the employer to the same or similar customers." (Doc. No. 1-1 at PageID 32.)

Defendants also argue that "the non-competition provision of the Agreement fails to even mention audio equipment and speakers, the core of MISCO's business." (Doc. No. 16.) This is a strawman argument. The provision does not need to specifically mention audio equipment or speakers for MISCO to fall within its terms. And, while it is apparent that Defendants' interpretation of the Agreement differs from PUI's interpretation, the evidence now supports a strong likelihood that PUI will be able to establish that Van Den Broek's employment with MISCO breached the Agreement's non-competition provision. Both a small breach and a large breach qualify as a breach of contract.

In summary, based on the information presented and the parties' arguments to date, the Court makes a preliminary finding that there is a strong likelihood PUI will succeed on its breach of contract claims. While some of the restrictions in the Agreement may ultimately be determined to be overly broad (potentially so as to require modification), the Court again makes a preliminary finding that they are reasonable restrictive covenants given PUI's business interests. *Raimonde v. Van Vlerah,* 325 N.E.2d 544, 547 (Ohio 1975) ("a covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public"). As found in the 10/21 Order, although the restrictions may require Van Den Broek to endure some hardship, the Court's preliminary determination is that they are narrow enough in scope to avoid imposing an undue hardship. The evidence supports a strong likelihood that PUI will be able to show that the Agreement is a binding contract, PUI has performed its contractual obligations, Van Den Broek has failed to fulfill his contractual obligations without legal excuse (for example, by "directly or indirectly … engag[ing] in a business enterprise in competition with" PUI through his employment with MISCO), and PUI

13

suffered damages as a result. *List Indus., Inc. v. Umina*, No. 3:18-cv-199, 2021 U.S. Dist. LEXIS 128716, 2021 WL 2916967, at *14 (S.D. Ohio July 12, 2021) (setting forth elements of a breach of contract claim under Ohio law); *AK Steel Corp. v. Miskovich*, No. 1:14-cv-174, 2014 U.S. Dist. LEXIS 197389, 2014 WL 11881030, at *4 (S.D. Ohio Mar. 3, 2014) (granting a TRO where information before the Court supported that a former employee breached an agreement by virtue of employment with a competitor).

Regarding the tortious interference with contract claims, the testimony made clear that both Defendants were aware of Van Den Broek's non-compete (at least) during July of 2021 when Van Den Broek reached back out to MISCO to seek the same job as in April of 2021 and MISCO offered him the job—which Van Den Broek accepted.   Both Van Den Broek and Digre acknowledged that Spain had told them Van Den Broek had a non-competition agreement and that his employment by MISCO would be a violation of that agreement.  Van Den Broek also admitted that he continued to work for PUI (and thus be exposed to PUI's propriety information, customers, distributors, and manufacturers) even after he had accepted the offer from MISCO.  And, even after PUI's attorneys sent both Van Den Broek and Digre the August 26 Correspondence in which the Agreement's confidentiality, non-competition, and non-solicitation provisions were quoted, MISCO continued to employ Van Den Broek.

Based on the information presented and the parties' arguments to date, the Court makes a preliminary finding that there is a strong likelihood PUI will succeed on its tortious interference with contract claims.  The evidence supports a strong likelihood that PUI will be able to show the existence of the Agreement, MISCO's knowledge of the Agreement (including its non-compete provision), MISCO's intentional procurement of the Agreement's breach by (at least) hiring and continuing to employ Van Den Broek despite that knowledge, a lack of justification, and that PUI

suffered damages as a result. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 1999-Ohio-260, 707 N.E.2d 853, 858 (Ohio 1999) (setting forth elements of a tortious interference with contract claim under Ohio law); *AK Steel*, 2014 WL 11881030, at *6 (movant met its burden for issuance of TRO in a case involving a claim for tortious interference with contract).

Finally, regarding PUI's trade secret claims, the evidence presented did not prove that Defendants have used PUI's trade secrets. However, PUI does not need to do so for injunctive relief to issue. Ohio Rev. Code § 1333.62(A) (allowing a court to enjoin "[a]ctual or threatened misappropriation"); 18 U.S.C. § 1836(b)(3)(A) (allowing a court to grant an injunction to prevent any actual or threatened "misappropriation" of a "trade secret," as defined in that act); *Dexxon Digital Storage, Inc. v. Haenszel*, 2005-Ohio-3187, 832 N.E.2d 62, 68 (Ohio Ct. App. 2005) ("the issuance of an injunction does not hinge on [movant] proving that the [non-movant] used the trade secrets, as threatened misappropriation of a trade secret is sufficient to allow the trial court to enjoin future use"). Testimony demonstrates that Van Den Broek was a key employee for PUI who had access to PUI's product designs, online simulator, product roadmap, identity of its manufacturing partners, identity of its customers, processes to customize products, costs, and profit margins. Testimony also demonstrates that not only did Van Den Broek have access to that information, but he was very involved in PUI's product development, product roadmap, company strategy, and development of the online simulator. Thus, for example, he knows the products that PUI expects to launch over the 12 to 18 months since he left PUI. And, as referenced above, Van Den Broek (who was a senior application engineer, then director of engineering, at PUI) is now working as a project design engineer for a company that PUI considers one of its eight to ten key competitors and that has at least some overlapping product offerings and overlapping customers or potential customers. Plus, the CEO of MISCO expects Van Den Broek to (at least) assist in

developing new product lines and interface with customers. Questions also remain regarding Van Den Broek's use of Dropbox very late at night the day before he resigned from PUI.[4]

Based on the information presented and the parties' arguments to date, the Court again makes a preliminary finding that PUI likely will succeed on its trade secrets claims for the same reasons set forth in the 10/21 Order. It remains undisputed that PUI has not provided consent for disclosure of any confidential information, PUI's products are sold throughout the United States, and Van Den Broek held a key position with PUI and was exposed to proprietary (likely trade secret) information while he was employed there for the past six years. The evidence at this very early stage of litigation supports that there is (at least) a threat of misappropriation given the circumstances and Van Den Broek's employment with MISCO. Ohio Rev. Code § 1333.62(A) (allowing a court to enjoin "[a]ctual or threatened misappropriation"); 18 U.S.C. § 1836(b)(3)(A) (allowing a court to grant an injunction to prevent any actual or threatened "misappropriation" of a "trade secret," as defined in that act); *see also Dexxon Digital Storage*, 832 N.E.2d at 69 (finding error in trial court's denial of preliminary injunction because defendant employees would not be able "to compartmentalize their knowledge of [plaintiff's] trade secrets and confidential information and to refrain from using that information in their jobs at" a competitor); *AK Steel*, 2014 WL 11881030, at *4, 6 (granting TRO and finding that "there is a risk that confidential or proprietary information of [plaintiff former employer] that has been acquired by [defendant former employee] could be used or disclosed—either purposefully or inadvertently—for the benefit of" defendant former employee or defendant new employer).

---

[4] The Court reviewed the submitted deposition of Jim B. Persinger, CFE, LPI. Mr. Persinger testified that he is a digital forensic cybercrime and software developer; he was retained by PUI's counsel on September 29, 2021; and he is still conducting his analysis of a laptop used by Van Den Broek.

### B. **Irreparable Injury**

Regarding the second factor, the Court finds that PUI has shown it would suffer irreparable injury without extension of the temporary restraining order and modification to prevent Van Den Broek from working for MISCO. First of all, "the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). As explained above, there is a strong likelihood that PUI will be able to show that Van Den Broek breached his non-compete covenant. Additionally, as shown above, Van Den Broek knows significant amounts of PUI's proprietary (if not trade secret) information, and he is now working for a company that—at least in some respects—is a competitor with overlapping product offerings, potential customers, and distribution methods. Among other things, Spain testified that a competitor with information about which products PUI plans to launch could minimize the success of that product launch, and he testified that PUI would likely need to lay off employees if it lost its relationship with its largest distributor—a company that Van Den Brock admitted he had worked with at PUI and that works with MISCO now too. Van Den Broek even acknowledged that he "could completely see why [Spain and Ricks] would be threatened" regarding its largest distributor.

Defendants also argue in their Hearing Memorandum that PUI's motion for a temporary restraining order was untimely. The Court disagrees. Any delay by PUI in filing the motion was minimal and reasonable (as explained by Spain at the evidentiary hearing) and was nowhere near as lengthy as the more than six-month delay in the case Defendants rely on for their argument (*see* Doc. No. 16 at PageID 145).

Based on the evidence presented and the parties' arguments to date, PUI has shown that it likely would suffer (at least) loss of fair competition without injunctive relief to enforce the restrictive covenants in the Agreement and prohibit the Defendants' disclosure or use of PUI's

trade secrets. *See Basicomputer*, 973 F.2d at 512; *Am. Sys. Consulting*, 514 F. Supp. 3d at 1010 ("based on the representations of Plaintiff that its business will be irrevocably damaged in the absence of continued temporary injunctive relief—representations the trial court credited—this Court similarly credits for present purposes the state court's finding that Plaintiff will suffer irreparable harm in the absence of a temporary restraining order"); *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 854-55 (S.D. Ohio 2000) (finding that failure to enforce the restrictive covenant against a former employee would present irreparable injury to plaintiff).

### C. Substantial Harm to Others

Regarding the third factor, the Court finds that, while there may be some harm to Van Den Broek and/or MISCO, modifying and extending the temporary restraining order would not cause them (or others) substantial harm. As the Court explained in the 10/21 Order, the acts restrained by this Order essentially are those that would be prohibited by the Agreement or by trade secret law. *See Avery Dennison*, 118 F. Supp. 2d at 855 (finding that defendant corporation would not be harmed by injunction, "as it has no right to the information in [defendant employee's] possession" and "[a]ny harm to [defendant employee] would be as a direct result of his own actions" given that he was aware of the restrictive covenants yet chose to accept employment with defendant corporation). Given the evidence presented at the November 1 evidentiary hearing, including the evidence supporting that Van Den Broek's employment with MISCO breaches the Agreement's non-compete provision, the Court modifies the TRO to more directly specify that Van Den Broek is prohibited from being employed by—or otherwise working for—MISCO. Van Den Broek acknowledged that PUI had identified on a "scorecard" (of which he was aware) eight to ten competitors, one of which is MISCO. Van Den Broek also testified that there are thousands of other companies that sell speakers in this country (although the Court acknowledges that significantly less would engineer speakers). Even though this Order specifically precludes Van

Den Broek from continuing his employment with MISCO (and deprives MISCO of its employee) for its duration, he is not precluded from employment that conforms with the Agreement and MISCO could have another employee cover his position in the interim. *See AK Steel*, 2014 WL 11881030, at *5.

With respect to the trade secret claims, the acts restrained by this Order are ones that Defendants have said are not (and have not) been committed by Defendants, so the restraint should have no impact on MISCO's business operations. And, the acts required of Defendants by this Order regarding preservation are acts that are relatively routine in litigation that involves alleged misappropriation of trade secrets.

### D. **Public Interest**

Regarding the fourth factor, the Court finds that the public interest would be served by modifying and extending the temporary restraining order. *See Avery Dennison*, 118 F. Supp. 2d at 855 ("valid contracts are the lynchpin of all commercial activity in society, and therefore, they must be honored," and "the public interest is served by discouraging practices aimed at surreptitiously acquiring trade secrets, by prohibiting misappropriation of trade secrets, and by condemning the theft of clients through unfair competition"); *Firstenergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013) ("the public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts").

### III. <u>**CONCLUSION**</u>

There is good cause both to modify and to extend the temporary restraining order. Having considered the four factors, the Court finds at this time that—when balanced together—they weigh in favor of extending the temporary restraining order in the 10/21 Order and modifying it to more directly specify that Van Den Broek is prohibited from being employed by—or otherwise working for—MISCO. PUI has satisfied its burden of justifying the modification and extension set forth

below. The Court also finds that there is no need for additional security beyond that already tendered by PUI.[5]

The Court **ORDERS** the following until and including November 18, 2021 (i.e., 14 days from the 10/21 Order's expiration) or until further order of this Court (whichever is earlier):

A. Van Den Broek is prohibited from being employed by—or otherwise working for—MISCO;

B. Van Den Broek, as well as any persons acting in concert with him, are hereby enjoined and restrained from directly or indirectly using, disclosing, copying, or transmitting PUI's confidential information (as defined in the Employment Agreement attached to the Verified Complaint as its Exhibit A) or trade secrets for any purpose (including, without limitation, to engage in competition with PUI or to solicit PUI's customers, clients, or employees);

C. Van Den Broek is required to abide by the terms of the Agreement attached to the Verified Complaint as its Exhibit A;

D. Van Den Broek, as well as any persons acting in concert with him, are required to preserve all originals, copies, or other reproductions in any form whatsoever, of any record or document containing, in whole or in part, PUI's confidential information (as defined in the Employment Agreement attached to the Verified Complaint as its Exhibit A) or trade secrets in their possession, custody, or control;

E. Until the time when a forensic image of them has been created by a licensed professional, Van Den Broek is required to preserve—and not delete anything from

---

[5] Neither party made any argument regarding the amount of security either at the November 1, 2021 evidentiary hearing or in any filings with the Court since issuance of the 10/21 Order. *See also Am. Sys. Consulting*, 514 F. Supp. 2d at 1010 (exercising the court's discretion not to require posting of a bond where the court concluded that posting of a bond was not warranted given the equitable circumstances of the case).

them or modify anything on them—the hard drive(s) of his personal computer(s); the hard drives of any other computer(s) he has used since January 1, 2020 that is in his possession, custody, or control; and all USB devices and thumb drives he has used since January 1, 2020 that are in his possession, custody, or control; and

F.   In accordance with Federal Rule of Civil Procedure 65(d)(2), this Order binds the following who receive actual notice of it by personal service or otherwise: the parties; the parties' officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with the parties or the parties' officers, agents, servants, employees, and attorneys.

**DONE** and **ORDERED** in Dayton, Ohio, this Thursday, November 4, 2021.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE